**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**


WILLIE HAMPTON                                                         MOVANT

v.                                                                    No. 2:00CR94-P

UNITED STATES OF AMERICA                                          RESPONDENT


## MEMORANDUM OPINION

This matter comes before the court on the amended motion by the movant to vacate, set

aside, or correct his sentence under 28 U.S.C. § 2255. The government has responded to the

motion, and the movant has replied and has supplemented his reply with exhibits and affidavits.

The matter is ripe for resolution. For the reasons set forth below, the instant motion to vacate,

set aside, or correct the movant's sentence shall be denied.

### Facts and Procedural Posture

Willie Hampton was indicted April 6, 2000, on three substantive counts of possessing

with intent to distribute and distributing cocaine base and powder cocaine. A superseding

indictment May 25, 2000, added a conspiracy count charging Hampton and Mack Arthur

Bowens with conspiring to distribute a large quantity of cocaine hydrochloride and base. After a

two-week joint trial, Hampton was acquitted of the conspiracy charge and convicted on the

substantive counts on January 30, 2001. On July 11, 2001, Hampton was sentenced to life

without possibility of parole on two counts and 30 years on the third count, all terms to run

concurrently. Hampton's convictions were affirmed on direct appeal, *United States v. Bowens*,

108 Fed. Appx. 945 (5th Cir. 2004). The Supreme Court denied certiorari February 28, 2005.

*Hampton v. United States*, 543 U.S. 1191 (2005).

On February 28, 2006, Hampton subscribed before his case manager and certified he placed in the prison mail, his *pro se* motion to vacate his convictions pursuant to 28 U.S.C. § 2255. He then retained counsel, who filed an amended motion which excluded Ground Five of the original motion. He now claims eight grounds for relief, some of which are related:

**Ground One:** Hampton did not own the garage in which the 7.5 pounds of cocaine at issue in this case was found; nor did he have control, authority, or dominion over it. In addition the 1999 Ford Expedition allegedly found in the garage was not, in fact, located there. As such, Hampton did not constructively possess the 7.5 pounds of cocaine at issue in this case.

**Ground Two:** The government introduced insufficient evidence for the jury to conclude that Hampton constructively possessed the 7.5 pounds of cocaine at issue in this case. As such, the jury's finding that Hampton constructively possessed the cocaine was erroneous.

**Ground Three:** The warrant used to search the garage in which the garage in which the 7.5 pounds of cocaine was found was based upon false information and affidavits submitted by state agents – namely, that Hampton owned the garage and vehicle in which the 7.5 pounds of cocaine was found. As such, the warrant was invalid, and the fruits of the search conducted under that warrant should not have been used against Hampton.

**Ground Four:** Lt. Hudson of the Tunica County Sheriff's Department coerced the testimony of Rubby Gooden that she purchased crack cocaine from Hampton. He did so holding her in jail when she was not a suspect in a criminal investigation and later by claiming that she was being housed as part of the Federal Witness Protection Program. As such, her testimony should not have been used against the petitioner at trial.

**Ground Five:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Withdrawn

**Ground Six:** The court did not have personal jurisdiction over Hampton at the time that he was transferred to the custody of federal agents because the state charges against Hampton had not yet been dismissed.

**Ground Seven:** Lt. Hudson wrote "No Bond - Hold for U.S. Marshall" and "Hold for U.S. Marshall Office – cases pending in U.S. Attorney Office" on Hampton's booking card which was dated March 20, 2000, before the execution of the search warrant used to collect evidence used against Hampton at trial. The federal criminal complaint against Hampton was not filed until four days later on

March 24, 2000. As such, the federal court did not have personal jurisdiction over Hampton.

**Ground Eight:** Appellate counsel was ineffective in failing to raise two meritorious issues: (1) the denial of Hampton's motion to sever, and (2) failure to challenge Hampton's sentence under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000).

**Ground Nine:** Trial counsel was ineffective for failing to investigate the grounds set forth above and mount a challenge to Hampton's conviction based upon those grounds.

### Grounds One, Two, Three, and Four
### (Ownership, Dominion, or Control Over the Garage and 1999 Ford Expedition):
### Decided on the Merits at Trial and on Direct Appeal[1]

All of Hampton's claims based on Lt. Hudson's actions were "raised and rejected in [his] direct appeal . . . . They are therefore barred from collateral review." *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997). "[I]ssues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 motions." *United States v. Webster*, 392 F.3d 787, 791 n. 5 (5th Cir. 2004). Indeed, trial and appellate counsel raised these issues repeatedly and used the challenge to Lt. Hudson's credibility as the centerpiece of the defense.

Hampton claims that since his trial he has obtained proof that he did not own or control the garage or possess the vehicle in which 7 ½ pounds of cocaine were found pursuant to the execution of a search warrant – and which formed the basis for his prosecution. As proof he submits Chancery Court land and tax records showing that Raymond Barker owned the property

---

[1]The court has taken much of the discussion regarding the events occurring in this court and the holdings of the Fifth Circuit Court of Appeals from the government's Answer and Memorandum in Opposition to Motion to Vacate, Set Aside, or Correct Sentence, as these events are not themselves in dispute. Instead, Hampton disputes the legal impact of the events described.

where the garage was located, as well as signed statements from employees of the Sheriff's Department averring that no records could be found that the vehicle had been impounded or released to Hampton. Thus, he argues that the evidence connecting him with the drugs found in the vehicle in the garage was falsified to obtain the search warrant and convict him at trial.

In a pretrial motion to suppress the evidence found in two searches incriminating Hampton, he alleged that the affidavits supporting the warrants were recklessly or intentionally false; "the core allegation that a 'reliable' informant purchased cocaine from Hampton is demonstrably false, and the affiant knew it;" and lacked probable cause when "stripped of the lies, distortions and material omissions and misrepresentations." The district judge conducted a two-day hearing on the motion in which the only witnesses were the informant, Rubby Gooden, and the affiant, Jerome Hudson. Hampton did not testify.

Under Hampton's theory, Jerome Hudson, the head of the narcotics division of the Tunica County Sheriff's Department, who arrested him for disorderly conduct August 24, 1999, seized his vehicle, a 1999 Ford Expedition, but did not enter it in the impound records of the Sheriff's Department. Instead, Hudson allegedly used it to plant the 7 ½ pounds of cocaine found in the search of the garage March 21, 2000. Hampton claims that as a part of this scheme, Hudson took Gooden into custody on the pretext she was in the Federal Witness Protection Program to coerce her into testifying falsely that she bought cocaine from Hampton. He contends further that a deposition of Sheriff Ellington taken after the trial proves that Hudson lied in circulating an official memorandum stating Gooden was "under the Federal Witness Program" and was to be monitored at all times. The various allegations cobbled together to create this scenario have been reviewed and rejected by the trial court, the jury, and the Fifth

Circuit Court of Appeals.

The trial court denied the motion to suppress in a December 18, 2000, memorandum

opinion, summarizing the factual basis for its ruling:

> On March 2, 2000, agents with the Tunica County, Mississippi, Sheriff's Department arrested Rubby Gooden for possession of crack cocaine and drug paraphernalia. After her arrest, she asked to speak with narcotics detective Lt. Jerome Hudson of the Tunica county Sheriff's Department to tell him that she would "do anything" to avoid going to jail. Lt. Hudson asked her who she could buy drugs from, and she informed him that she had purchased the crack cocaine from Willie Hampton and Mack Arthur Bowens. Lt. Hudson and other narcotics agents arranged for Gooden to make a controlled purchase of crack cocaine from Hampton and Bowens.

> On that same day, agents from the Mississippi Bureau of Narcotics, as well as agents from the Tunica County Sheriff's Department, equipped Gooden with a tape recorder and a transmitting device. Additionally the agents provided Gooden $250 "buy money," and agents recorded the serial numbers on the bills. After the agents ensured that Gooden had no drugs on her person before the controlled buy took place, she went to a residence at 1069 Collins Street, where she claims to have purchased drugs from Hampton before. According to the taped transaction and Gooden's testimony before this Court, after Gooden arrived at the residence, she asked the female who answered the door for Willie Hampton. When Hampton came to the door, Gooden asked him "for a quarter" (meaning a quarter ounce of crack cocaine) and he gave it to her. Subsequently, Gooden left the house and met the agents to turn over the drugs.

> Based on this controlled buy, the agents applied for and received a search warrant to search the residence at 1069 Collins Street. Tunica County Justice Court Judge Ted Emmanuel authorized the warrant. While searching the residence, agents found some of Hampton's personal belongings in a bedroom. Also found in the bedroom were crack cocaine, scales with cocaine residue, and several boxes of plastic baggies. Agents found some of the money used by Gooden to buy the crack cocaine in Hampton's pocket.

> Tunica County agents had also received information from several citizens that Hampton allegedly used a garage located at the intersection of Hickory and Edwards streets in Tunica to distribute, store and manufacture controlled substances. This information, coupled with the evidence seized at the residence on 1069 Collins Street the previous day, prompted the agents to apply for a warrant on March 21, 2000, to search the garage. The warrant, too, was authorized by Judge Emmanuel. When the agents searched the garage, they

located a Ford Expedition.  Inside this vehicle they found several kilos of crack cocaine, as well as powder cocaine.  Also inside the vehicle, agents found scales, baggies and documents indicating Hampton's ownership of the vehicle.  Inside the garage was a package containing coffee grounds, commonly used to mask the smell of cocaine.

The court concluded that while the state court judge was not "told about Gooden's drug use and prior arrests, this court is convinced that no one intentionally misrepresented important facts to [the] judge, "and he had 'a substantial basis for . . . concluding' that probable cause existed."

In a footnote to the factual basis, the court addressed the allegation that Hudson coerced Gooden to "set up" Hampton:

Several so-called affidavits have been submitted to this Court signed by Gooden wherein she states that Lt. Hudson "framed" Bowens and Hampton.  In these affidavits, Gooden claims Lt. Hudson told her after her arrest that unless she helped the department "set up" Bowens and Hampton, her children would be taken away from her and she would be sent to jail for a long time.  However, based on Gooden's testimony at the hearing on the motion to suppress, the Court is convinced that she voluntarily assisted the department in obtaining information about Hampton and Bowens.

At the two-week trial, Hampton testified in his defense that he did not know Rubby Gooden and had never talked to her.  He couldn't say for sure he had never seen her before, but he was positive he did not see her on March 20.  (R 1955-1956)

He testified he bought the 1999 Ford Expedition he was driving when arrested August 24, 1999, at an auction in California.  It was parked on the side of the road when he was arrested.  He posted bond after three or four days but did not get his vehicle back.  (R 1927-1928, 1931-1932)

He testified that in 1997 he struck a deal with Raymond Barker to purchase the property where the garage is located by payment in three annual installments.  The deed was not to be recorded until after July 20, 2000, when the last installment was paid.  Hampton testified that he went to the property only three times, the last being August 23, 1999, when he saw Ellis Koonce and said hello to him while moving a downed tree limb.  When after two or three days he did not get his Expedition, he decided to return to California and wait to deal with it when he came back for his court date December 8, 1999.  Willie Hampton testified that he had never seen the cocaine found in the garage, did not own the property, and had no control over the property.  (R 1932, 1934-1940, 1967)

Hampton's testimony stood in sharp contrast with the testimony of several disinterested witnesses, as well as with Hudson, Gooden and others.  Raymond Barker, a professional engineer and in the real estate business, testified that he owned the property on which the garage was situated.  It was a three-car concrete block building.  He sold it to Willie Hampton July 12, 1997, for $8,000 cash down and three annual payments of $12,500 plus interest to be paid with the last payment.  Hampton made two $12,500 cash payments for 1998 and 1999, but did not pay the interest or final payment in 2000.  The deed was not to be recorded until after the last payment.  Barker had continued to use the garage for storage, but when Hampton made the second payment in August 1999, he told Barker that he needed to put some cars in the garage and asked him to get his belongings out.  Barker did so.  Hampton later returned and told him he had changed the locks on the doors to the garage.  Although Barker never saw any of the cars, Willie Hampton told him he had some in there.  (R 644-650)

Ellis Koonce, the Town of Tunica fire chief, lived across the street from the garage. He testified that one Sunday afternoon, sometime between Thanksgiving and Christmas 1999, he was in his front yard and noticed a burgundy Expedition, probably a 1998 model, parked in front of the garage. A man came out, got in the Expedition, and drove over to the paved parking in front of Koonce's house – then came up and introduced himself as Willie Hampton. He said he had a friend in Atlanta who was an architect, who might build a house on the lot and move to Tunica. (R 1216-1218)

Gerald Connell was the wrecker service operator who towed Hampton's Expedition after his arrest August 24, 1999. His testimony and records were entered by stipulation. His testimony was that he towed the vehicle to the Sheriff's Department's compound on August 24, 1999. Two days later on August 26, 1999, Willie Hampton's brother paid Connell's bill which reflects a cash payment of $125.00 for towing and storage, the towing charge being $85.00. Upon payment of the bill, Connell was satisfied and decided that the release of the vehicle would be up to the Sheriff's Department. (R 881-883 & Ex. 50)

Ferlando Esco, a jailmate of Hampton, testified that he and Hampton discussed their cases, and Hampton told him that the authorities made a mistake in his case and gave him back his Expedition without the release of his paperwork. (R 279-280)

FBI agent Thomas Bohlke testified that he was involved in the investigation of Hampton from December 1999 and did not observe improper behavior such as planting drugs or buy money on the part of Hudson. (R 1235-1236)

Rubby Gooden and Jerome Hudson testified and were cross examined at length. Gooden testified that neither Hudson nor any of the state or federal agents or prosecutors asked her to

plant drugs or money on anybody.  (R 974-975)  Hudson testified that he did not know what was in the garage before the search and did not plant the 7 ½ pounds of cocaine there.  (R 403, 414)

The essence of Hampton's defense at trial, as summed up in his counsel's closing argument, was that the case against him was a web of lies emanating from Hudson.  The "heart of the case" he argued, was "what happened to that Expedition."  He lied about the wrecker service being responsible for the custody and release of the vehicle after it was towed.  "Where did it go?  It went to the Tunica County Sheriff's Department," he declared.  "Something stinks in Tunica County.  Something is rotten, and it's smack dab in the middle of that Sheriff's Department with that man named Jerome Hudson."  He lied about not running the VIN.  He lied about recognizing Hampton's voice while monitoring transmission of Gooden making the controlled buy.  "Hudson then told a whole bunch of lies, told them before in this case . . . when he was getting the search warrant . . . in the pretrial part of this case . . . in this courtroom about what he needed to say in order to get a search warrant."  He lied about seeing Hampton driving the white Mustang.  He lied about Hampton leaving the Collins Street residence.  He lied about receiving information about activity at the garage.  Before moving on to other witnesses in the same vein, defense counsel summarized accusations against Hudson:  "He's a demonstrated liar. And he has lied to you.  And I submit to you that the business about not knowing what happened to the Ford Expedition in August 1999 is his biggest lie of all."  (R 2199-2209)

As for Rubby Gooden, counsel said she "is a pathetic, pitiful creature.  And I feel terribly sorry for her.  But that does not mean I can't stand up here and tell you that anybody that's used crack cocaine since 1992 should not serve as a basis for any sort of criminal conviction.  She can't have much of a cardiovascular system left and certainly not much of a brain left.  And that

is demonstrated by the various testimony she has given on various occasions.  She can't keep it straight."  In concluding his review of Gooden's testimony, counsel urged the jury to "bear in mind where she is right now and where she went when she left here that day.  That's the Tunica County Jail, and you know who works there."  (R 2213-2216)

Defense counsel subjected Hudson to withering cross-examination and presented the jury a direct challenge to Hudson's credibility – indeed, he castigated Hudson as liar in closing arguments.  Unfortunately for Hampton, the jury chose to believe the prosecution witnesses and found Hampton guilty of all charges but conspiracy.  Hampton can point to no error in the jury's decision as the jury is the final arbiter of witness credibility.  *United States v. White*, 219 F.3d 442, 448 (5th Cir. 2000).

On February 8, 2001, Hampton filed a motion for a judgment of acquittal or new trial.  He renewed his challenge to the validity of the garage search on the ground that it "should now be abundantly clear" that Hudson obtained the warrant by use of "false and unsupported allegations."  He argued that the "evidence in the record clearly establishes that" the Collins Street residence is neither Hampton's residence nor under his dominion or control; thus, whatever was found there "is not legally attributable to Hampton."  He contended that the jury's verdict should be set aside on the ground that the "testimony of Hudson, Gooden and Jones was just not believable as a matter of law," and the verdict "is against the overwhelming weight of the evidence."

In a supplemental motion for a new trial filed February 20, 2001, Hampton's counsel alleged he had recently learned that Hudson had been fired by the sheriff "for misconduct in holding Rubby Gooden basically as a hostage during the court phase of this trial and for

falsifying documents and lying to his superiors about his reason for holding Ms. Gooden."  The

motion was supported by an affidavit stating – contrary to her trial testimony – that she was held

by Hudson without bond against her will and she was seeking legal representation to pursue a

law suit against Tunica County for false imprisonment.  The district court denied Hampton's

motion for a new trial June 1, 2001, without an evidentiary hearing.

The Fifth Circuit Court of Appeals affirmed the conviction, holding that "Hampton's

primary argument below and on appeal hinge[d] on the credibility of Lieutenant Hudson and the

informants the agents used."  *United States v. Bowens*, 108 Fed. Appx.  945, 951 (5th Cir. 2004).

His "theory was that Lieutenant Hudson planted the drugs," and that the exclusion of evidence of

Hudson's alleged bias was prejudicial.  The court held: "However, a review of the record reveals

that any error was harmless.  The government presented strong corroborating testimony and

evidence of guilt."  *Id.* At 953-954.  Hampton renewed his challenge to the credibility and

sufficiency of Hudson's warrant applications for the residence where the controlled buy occurred

and the garage where the Expedition was found, but the Fifth Circuit held there was "no error in

denying the motion to suppress."  *Id.* at 968-969.

In a motion for a new trial, Hampton contended that evidence discovered after trial had

been suppressed by the government in violation of *Brady* and showed that "Hudson improperly

held Gooden in jail during the investigation and throughout the trial . . . in order to coerce her

testimony."  He also claimed that "Hudson altered an arrest warrant to indicate Gooden was still

under arrest during the trial when the charge had in fact been dismissed," and that "Hudson sent

a letter to the Tunica County Sheriff's Department explaining Gooden was in the Federal

Witness Protection Program and was not to be visited by anyone, when in fact she was in the

Federal Emergency Witness Assistance Program." The court held that there was "no material, non-cumulative, newly-discovered evidence of Lieutenant Hudson's actions . . . to warrant a new trial," and the district court did not abuse its discretion in denying the motion without an evidentiary hearing. *Id.* at 952, 957 & n. 32, 958-959 & n. 41.

Hampton's 2255 motion does not add anything new to Willie Hampton's claim that Lieutenant Hudson framed him with lies, planted evidence, and the coerced cooperation of Rubby Gooden. The only new evidence Hampton provides to the court is the March 2002 deposition of former Tunica County Sheriff Jerry Ellington, stating that he fired Hudson because he lied in a memorandum by stating that Gooden was in the Federal Witness Protection Program. The deposition merely duplicates facts supported by other evidence in the record. Further, Ellington's deposition testimony simply does not establish that Hudson ever stated that Rubby Gooden was under the Federal Witness *Protection* Program. Ellington testified he confronted Hudson with the memorandum and asked him to explain it:

Q       And what was his response?

A       She was under the Federal Witness Protection Program.

Q       Excuse me?

A       She was under the Federal Witness Protection Program.

Q       He told you that she was under the Federal Witness Protection Program?

. . .

Q       Well tell me the rest of the conversation.

A       That basically was it. He said he didn't understand what this was, I guess concerning the termination, and he also said that the form here was – she was under the Federal Witness Protection Program.

And then he said, "No, I didn't say that she was under the Federal Witness

Protection Program.  I mean, she was a federal witness."  I said, "This is not what the document says.  It says she is under the Federal Witness Protection Program."

Q	It doesn't say she's under a Federal Witness Protection Program, does it?

A	No . . . .   Says she's under a Federal Witness Program.

Q	So he did then tell you that she was –

A	Was a witness, but she wasn't under a Federal Witness Program.

. . .

Q	So he told you that she was a federal witness, not under a Federal Witness Protection Program.

A	Yes, ma'am.  Not under a Federal Witness Program.

Ellington Depo. pp. 45, 63-65.

Ellington's deposition does not present any relevant, non-cumulative, newly discovered evidence of Lieutenant Hudson's actions that would warrant consideration on § 2255 review. *United States v. Bowens,* 108 Fed. Appx. 945, 959 & n. 41 (5th Cir. 2004), *cert. denied*, 543 U.S. 1191 (2005).  All of Willie Hampton's § 2255 claims based on Hudson's actions were raised and rejected on direct appeal – and are therefore barred from collateral review.  *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997).  Issues raised and resolved in a previous appeal from an original judgment of conviction cannot be considered in a motion for § 2255 relief.  *United States v. Webster*, 392 F.3d 787, 791 n. 5 (5th Cir. 2004).  For this reason, Grounds One, Two, Three, and Four must be dismissed as procedurally barred.

## Grounds Six and Seven:  Want of Personal Jurisdiction

To succeed on his claim of ineffective assistance of counsel, Willie Hampton must prove both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland*, 466 U.S. at 687.  The court must analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight.  *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988).  The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  To prove prejudice, petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable.  *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir.), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997).  As discussed below, Willie Hampton has not met this burden.

Hampton argues in Ground Six of the instant motion that the court did not have personal jurisdiction over him at the time that he was transferred to the custody of federal agents because the state charges against him had not yet been dismissed.  This argument is without merit, as the primacy of state or federal jurisdiction is a matter for the two sovereigns to determine, and the defendant Hampton lacks standing to mount such a challenge.  *Ponzi v. Fessenden*, 258 U.S. 254 (1922), *Derengowski v. U. S. Marshal, Minneapolis Office, Minn. Division*, 377 F.2d 223 (8th Cir. 1967).

> One accused of crime has a right to a full and fair trial according to the law of the government whose sovereignty he is alleged to have offended, but he has no more than that. He should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other, unless the necessary operation of such machinery prevents his having a fair trial. He may not complain if one sovereignty waives its strict right to exclusive custody of him for vindication of its laws in order that the other may also subject him to conviction of crime against it. *In re Andrews,* (D.C.) 236 F. 300; *United States v. Marrin*, (D.C.) 227 F. 314. Such a waiver is a matter that addresses itself solely to the discretion of the sovereignty making it and of its representatives with power to grant it.

*Ponzi*, 258 U.S. at 260. For this reason, a state prisoner has no standing to attack the issuance and operation of a federal writ of *habeas corpus ad prosequendum*. *Derengowski*, 377 F.2d 223.

Hampton attempts to overcome this rule under the holdings of *Harkrader v. Wadley*, 172 U.S. 148, 164, 19 S. Ct. 119 (1898) and *Wilson v. Schnettler*, 365 U.S. 381, 385 (1961). *Harkrader*, however, can be distinguished because it involved an attempt by a federal court sitting in equity to *enjoin* criminal proceedings in a state court. 172 U.S. at 170. The Supreme Court found that the federal court could not enjoin the prosecution of the state defendants for a variety of reasons, including the fact that the nature of the rights being determined was completely different in each court – tort liability (in federal court) versus criminal liability (in state court). *Id.* at 167-168. Also, the Court held that the federal court could not have taken jurisdiction over the offense charged in the indictment – nor could it have assumed jurisdiction, withdrawn the case from a state court, or suspended or stayed the proceedings. *Id.* at 168. The Court summarized its ultimate holding thus:

> We are of opinion, then, that a court of equity, although having jurisdiction over person and property in a case pending before it, is not thereby vested with jurisdiction over crimes committed in dealing with such property by a party before the civil suit was brought, and cannot restrain by injunction proceedings regularly brought in a criminal court having jurisdiction of the crime and of the accused. Much more are we of opinion that a circuit court of the United States, sitting in equity in the administration of civil remedies, has no jurisdiction to stay

by injunction proceedings pending in a state court in the name of a state to enforce the criminal laws of such state.

*Harkrader v. Wadley*, 172 U.S. 148, 170, 164, 19 S. Ct. 119, 128 (1898).  The facts of Hampton's case are simply not analogous to the facts of *Harkrader*, and the Supreme Court made that distinction in its opinion.

The *Schnettler* case, on the other hand, actually supports the *government's* position, rather than Hampton's.  Hampton cites the following language to support his position that the this court did not have personal jurisdiction over him:

> [The state] court, whose jurisdiction first attached, retains jurisdiction over this matter to the exclusion of all other courts – certainly to the exclusion of the Federal District Court – until its duty has been fully performed . . . .
>
> . . .
>
> We live in the jurisdiction of two sovereignties.  Each has its own system of courts to interpret and enforce its laws, although in common territory.  These courts could not perform their respective functions without embarrassing conflicts unless rules were adopted to avoid them.  Such rules have been adopted.

*Wilson v. Schnettler*, 365 U.S. 381, 385 (1961).  However, the language immediately following shines more light on the present case:

> One of [these rules] is that an accused 'should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other, unless the necessary operation of such machinery prevents his having a fair trial.'  *Ponzi v. Fessenden*, 258 U.S. 254, 260, 42 S.Ct. 309, 310, 66 L.Ed. 607.  Another is that federal courts should not exercise their discretionary power 'to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent . . . .'  *Douglas v. City of Jeannette, supra,* 319 U.S. at page 163, 63 S.Ct. at page 881.

The issue the Supreme Court addressed in *Schnettler* is one of standing, or more appropriately in this case, want of standing:  "The exercise of jurisdiction over a prisoner who has violated the

law of more than one sovereignty and the priority of prosecution of the prisoner is solely a question of comity between the sovereignties *which is not subject to attack by the prisoner*." *Derengowski v. U. S. Marshal, Minneapolis Office, Minn. Division*, 377 F.2d 223 (8th Cir. 1967) (emphasis added); *see also Bullock v. State of Mississippi*, 404 F.2d 75-76 (5th Cir. 1968).

At the heart of these cases analyzing the interplay between state and federal jurisdiction is the desire to avoid a confrontation between state and federal courts over which court gets to proceed first with its prosecution – and which court must wait. In Hampton's case, however, no such confrontation existed. Certainly the federal court exercised personal jurisdiction over Willie Hampton, even though Hampton's state case had not yet been dismissed. On the other hand, the state did not object to the prosecution of federal charges, and, indeed, from all indications in the record, acquiesced in that prosecution. In any event, as discussed above, the only party in a position to object to the federal prosecution of Willie Hampton in this case was the State of Mississippi (which remained silent on the issue). Put simply, Willie Hampton does not get to choose which sovereign may take priority in prosecuting him. This ground for relief thus has no merit and shall be dismissed.

### Ground Eight: Ineffective Assistance of Appellate Counsel for Failing to Raise Two Meritorious Issues: (1) the Denial of Hampton's Motion to Sever, and (2) Failure to Challenge Hampton's Sentence Under *Apprendi v. New Jersey*

Hampton alleges that his appellate counsel was ineffective in failing to challenge the denial of Hampton's motion to sever his trial from that of his co-defendant Mack Arthur Bowens. The government has argued, and the court so finds, that the sole basis of the motion to sever was the anticipated introduction of a typewritten confession of Hampton's co-defendant Mack Arthur Bowens. The confession was not, however, introduced into evidence against

Willie Hampton.  As such, the court's ruling on this issue became moot, and appellate counsel had no basis upon which to appeal the denial of the motion to sever.

In his post-conviction motion under § 2255, Hampton presents two arguments:

> The joinder of Bowens and the introduction of evidence of his criminal activity made the jury unable to "sort out the evidence reasonably and view . . . the evidence relating to [each] defendant separately."  *United States v. Merida*, 765 F.2d 1205 (5th Cir. 1985).  Moreover, the joinder was improper under Federal Rules of Criminal Procedure, Rule 8(b).

Both of these arguments are without merit.

The *sole* basis for trial counsel's motion for a severance was the potential prejudicial effect of the typewritten confession of Mack Arthur Bowens.  That typewritten confession was not entered into evidence; thus, the issue of the denial of the motion to sever became moot.  The court cannot discern what Hampton believes his appellate counsel could have done regarding the court's ruling on the motion to sever.

Hampton next argues that joinder was improper under Federal Rule of Criminal Procedure 8(b), which reads:

> **Joinder of Defendants.**  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Hampton does not discuss this conclusory allegation, and the court cannot discern how its decision to deny Hampton's motion for a severance could be improper under this rule.  As such, the court finds this ground for relief to be without merit.

In his final substantive claim, Hampton alleges that counsel should have argued on appeal that Hampton's sentence was unconstitutional under the holding of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000), and had he done so, even if unsuccessful on direct appeal, he would have preserved the issue for successful review in the Supreme Court under *United States v. Booker*, 543 U.S. 220 (2005).

The government has argued that counsel cannot be deemed constitutionally ineffective for failing to anticipate a subsequent development in the law, citing *United States v. Webster*, 392 F.3d 787, 796-797 (5th Cir. 2004).  *See also*, *Lucas v. Johnson*, 132 F.3d 1069, 1078-1079 (5th Cir. 1998), *cert. dismissed*, 524 U.S. 965 (1998).  Hampton argues in rebuttal that the holding in *Apprendi* was clear enough at the time of his trial and sentencing that the later holdings in *United States v. Booker*, 125 S.Ct. 738 (2005) and *Blakely v. Washington*, 124 S.Ct. 2531 (2004) hardly constitute subsequent development in the law.  Hampton argues that counsel for other criminal defendants convicted near the time of Hampton's conviction knew enough to preserve *Apprendi* issues on appeal, and that Hampton's appellate counsel should have done so, as well.  Hampton's argument is insufficient to sustain his claim.  Although *Blakely* and *Booker* set forth rules that are rational extensions of the holding in *Apprendi*, the rules *are* extensions of *Apprendi*, and the court finds that they extend the holding in *Apprendi* enough to constitute a subsequent development in the law.

In addition, any error in Hampton's sentence was harmless.  Willie Hampton was sentenced under statutory mandates and based upon his prior convictions.  A jury found Willie Hampton guilty on Count Six of possessing with intent "to distribute in excess of 50 grams of . . . cocaine base and . . . in excess of 500 grams of cocaine hydrochloride . . . in violation of 21

U.S.C. § 841(a), (b)(1)(A)." Section 841(b)(1)(A)(iii) provides that "such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life . . ." The statute also reads that if a person commits such a violation "after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment . . . ." Willie Hampton was charged in an Information under 21 U.S.C. § 851 with two such convictions and filed no written response denying the convictions. He admitted both convictions at sentencing – but disputed the underlying facts of one. (R. Vol. 16 pp. 21-25) He was also convicted by the jury on Count Four with distributing in excess of 5 grams of cocaine base under 21 U.S.C. § 841(b)(1)(B), which provides for a penalty of 10 years to life if committed after one prior drug felony conviction, and on Count Five for possession with intent to distribute an unspecified amount of cocaine base in violation of 21 U.S.C. § 841(b)(1) with a penalty of not more than 30 years if committed after one prior drug felony conviction.

The court sentenced Willie Hampton to the maximum sentence on Counts Four and Five to be served concurrently with the statutorily mandated life sentence on Count Six.

Because he had been convicted of two prior drug felonies, Willie Hampton qualified as a career offender under § 4B1.1 of the Sentencing Guidelines. A career offender is automatically assigned a criminal history category of VI and an offense level of 37. The Guideline Sentence range for an offense level of 37 is 360 months to life. There is no Sixth Amendment violation regarding post-trial determination of career offender status because the only fact supporting career offender status for a judge to determine is the offender's prior convictions (which are

specifically excluded from Sixth Amendment analysis under *Apprendi* and *Booker*)[2]. *United States v. Guevara*, 408 F.3d 252, 261 (5th Cir. 2005), *cert. denied*, 546 U.S. 1115, 163 L. Ed. 2d 898 (2006).

Willie Hampton has not carried the burden of persuasion that, had he been sentenced under an advisory scheme, the sentence imposed would have been different. *Id.* at 263. "[B]ecause the District Court sentenced [Hampton] to the maximum allowable punishment (life) under both the Guidelines and [§ 841], and because the maximum sentence the Court can impose, even post-*Booker*, remains limited to life, there is no reason to believe that the sentencing court would sentence [Hampton] any differently merely because the Guidelines are advisory." *Id.*

### Ground Nine:  Cumulative Error

In his last ground for relief, Willie Hampton argues that counsel failed to investigate all previous grounds – and that the errors set forth in those grounds accumulate to an error of constitutional magnitude.  This is little more than a cumulative error argument.  The court has found, however, that the grounds discussed above do not set forth any errors – of constitutional magnitude or otherwise.  As such, there are no errors to accumulate, and this ground for relief

---

[2]The court declines Willie Hampton's invitation to ignore the plain language of the Supreme Court's holding in *Booker* that excludes a defendant's prior convictions from the facts that must be presented to a jury and proven beyond reasonable doubt:

> Accordingly, we reaffirm our holding in *Apprendi:*  Any fact (***other than a prior conviction***) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.

*United States v. Booker*, 125 S.Ct. 738 (2005) (emphasis added).

must be denied, as well. *United States v. Moye,* 951 F.2d 59, 63 n. 7 (5th Cir.1992) (claim of cumulative error fails absent meritorious arguments of error).

To the extent that Hampton is arguing that trial and appellate counsel failed to investigate the alleged misdeeds of Jerome Hudson, such an allegation is unsubstantiated in the record. The focus of Hampton's defense was to challenge Jerome Hudson's credibility. The evidence Hampton characterizes as new in this motion under 28 U.S.C. § 2255 is not new at all – and would not change the outcome of trial or sentencing if it had been available. Hampton's "new" evidence regarding the date his state charges were dismissed had no impact on this court's personal jurisdiction over him. His "new" evidence regarding the ownership of the garage in which the 7 ½ pounds of cocaine were found does not refute the evidence presented at trial that he was buying the property and had control over the garage and the Ford Expedition inside. His evidence regarding Jerome Hudson's alleged statement that Rubby Gooden was being held in the Federal Witness Protection Program actually proved that Jerome Hudson never made that statement. His evidence regarding missing paperwork at the lot in which his Ford Expedition was impounded shows only that the paperwork itself cannot now be found. It does not refute the evidence presented at trial proving that investigators found 7 ½ pounds of cocaine in the Expedition, which was located inside the garage, which, in turn, was under the control of Willie Hampton, who was purchasing the garage from the Barkers.

In sum, all of Willie Hampton's grounds for relief in the instant motion are without merit, and the instant motion to vacate, set aside, or correct his sentence shall be denied. As all the facts necessary to the resolution of the issues in the instant motion can be found within the court

record, Willie Hampton's motion for an evidentiary hearing shall be denied.  A final judgment consistent with this memorandum opinion shall issue today.

**SO ORDERED,** this the 17t day of December, 2007.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE